UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Elias FARAH, Defendant–Appellant–
Cross–Appellee.

Nos. 1016, 1017, Docket 89–1477, 89–1533.

United States Court of Appeals,
Second Circuit.

Argued March 10, 1993.

Decided April 21, 1993.

Cheryl L. Pollak, Asst. U.S. Atty., Brooklyn, NY (Mary Jo White, U.S. Atty. E.D.N.Y., Emily Berger, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee-cross-appellant.

Philip Katowitz, New York City, for defendant-appellant-cross-appellee.

Before TIMBERS, KEARSE, and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Elias Farah appeals from a final judgment entered in the United States District Court for the Eastern District of New York convicting him, following his plea of guilty before Raymond J. Dearie, *Judge*, on one count of possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i) (1988); and one count of structuring monetary transactions, in violation of 31 U.S.C. §§ 5322(b) and 5324(1) (1988). He was sentenced principally to 188 months' imprisonment on the narcotics count and 60 months' imprisonment, to be served concurrently, on the money-laundering count, to be followed by a four-year term of supervised release. On appeal, Farah contends principally that, in calculating his sentence under the applicable federal Sentencing Guidelines ("Guidelines"), the district court erred in increasing his offense level on account of his role in the narcotics offense. On its cross-appeal, the government contends that the district court erred in increasing Farah's offense level on that account by only two steps rather than three. For the reasons below, we agree with the government, and we accordingly vacate the judgment and remand for resentencing.

## I. BACKGROUND

The present prosecution charged Farah and others, several of whom also pleaded guilty to various counts and whose appeals have been disposed of separately, with operating a large-scale heroin importation, distribution, and money-laundering organization. The facts presented at the sentencing hearing revealed that from October 1986 to January 1988, the organization had imported between one and three kilograms of heroin into the United States each month. Mary Ann Hanna, Farah's aunt, was the head of the organization's United States operations. The organization used a number of couriers to bring the heroin into the United States.

Farah was Hanna's "right hand man." Described by the district court as "ubiquitous," he performed a variety of functions. Farah was one of those who met foreign couriers at United States airports, received the heroin, and delivered it to the organization's principal customer; he collected payment from the customer; he purchased bank checks in order to launder the cash; he recruited and supervised other workers in the laundering activities. District Court Sentencing Memorandum dated August 17, 1992 ("Sentencing Decision"), at 27. In addition, when Hanna was away, Farah served as the head of the United States operation. Thus, after the sentencing hearing, the district court found that

[t]he credible evidence demonstrated beyond question that the defendant Elias

Farah was a manager and supervisor of the organization. The ubiquitous Farah served as a trusted "right hand man" for Mary Ann Hanna, the admitted head of the conspiracy in the United States. Unlike any other participant, Farah was entrusted to perform all of the critical assignments—meeting foreign and domestic couriers, transporting the heroin to the Detroit market, meeting with the principal customer, Roy Mercer, collecting proceeds, laundering the cash through the purchase of bank checks, supervising and recruiting other workers in the laundering activities, and most importantly, serving as appointed head of the United States operations during Hanna's extended trip to Lebanon during the spring and summer of 1987. Stated simply, Farah did everything Hanna did when she left the United States in search of a new heroin source. During that period, Farah oversaw every phase of the operations from the importation of the drugs to the laundering and transmittal of the proceeds out of the country.

*Id.* at 26–27. The court therefore found that the evidence presented at the hearing "comfortably support[ed] the finding that Farah was a manager and supervisor." *Id.* at 27. It also found that "the group Farah supervised certainly included more th[a]n five participants—be they couriers, money launderers or other functionaries." *Id.* at 28.

The Guidelines require that a defendant's offense level be adjusted according to his role in the offense. Aggravating roles require increases as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Guidelines § 3B1.1. Thus, the court's findings that Farah was a supervisor of more than five participants placed him within subsection (b) of § 3B1.1, which required a three-step increase.

Nonetheless, the court declined to increase Farah's offense level by more than two steps, stating as follows:

While the evidence adduced at the *Fatico* hearing comfortably supports the finding that Farah was a manager and supervisor, the application of Guideline 3B1.1 is, in the Court's view, not so obvious. Unquestionably, Guideline 3B1.1(c) requires an upward adjustment of two levels in light of the Court's finding that Farah was a supervisor. Further, an additional level may be required by Guideline 3B1.1(b), because the group Farah supervised certainly included more th[a]n five participants—be they couriers, money launderers or other functionaries; and no one has been heard to argue throughout these proceedings that the criminal activity here was not "otherwise extensive." *See* Guideline 3B1.1(c).

Despite these findings, the Court concludes that a two-level adjustment is more appropriate. A few references to the corresponding Commentary arguably support this conclusion. At the same time, should a three-level adjustment be required, the Court believes a modest one-level downward departure pursuant to Guideline 5K2.0 would nevertheless be appropriate. Implicit in the graduated adjustments prescribed in Guideline 3B1.1 is the notion that as the size of the organization increases, the role of manager or supervisor necessarily means added responsibility and therefore greater culpability—an equation which ordinarily follows easily in most cases. But not here. As the Commentary to Guideline 3B1.1 observes:

This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more

from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

*Id....; see* Application Note 3.

As the Court has commented before, Farah's part-time supervisory role does not readily translate into enhanced culpability or responsibility. His management responsibilities were acquired episodically and do not in this Court's view reflect a more significant commitment to the affairs of the organization. His fortuitous position at the reins was triggered more by necessity than by choice or performance and Hanna's selection of her nephew as periodic caretaker of the organization evidences her reliance on him as a trustworthy stand-in, not a permanent delegation of any decision-making authority. Certainly there is no evidence to suggest that Farah would likely profit more than any other participant, and the Court's assessment of Farah as an individual strongly indicates that Farah is less likely to "recidivate" than most of his codefendants. Whether the three-level adjustment is required or not, the Court concludes that the relatively unusual circumstances of this case and, more particularly, Farah's role in it, present a mitigating factor to a degree that not [*sic*] adequately considered by the Commission.

*Sentencing Decision* at 27–30. Accordingly, the court calculated Farah's offense level for the narcotics offense using a two-step increase for his role in the offense.

## II. DISCUSSION

Farah has appealed, contending principally that the court should not have increased his offense level at all for his role in the offense. The government has cross-appealed, contending that the court was required to increase the offense level by three steps rather than two and was not authorized to depart downward on the bases articulated. For the reasons below, we find merit in the cross-appeal.

### A. *Application of § 3B1.1*

■ Farah's contention that the district court erred in increasing his offense level even by as few as two levels for his role in the offense need not detain us long. The sentencing court's findings as to the defendant's role in the offense will be overturned only if they are clearly erroneous. *See, e.g., United States v. Rivera,* 971 F.2d 876, 893 (2d Cir.1992); *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir.1991). In the present case, there was ample evidence to support the district court's finding that Farah was a supervisor or manager of the criminal activity conducted by the organization. Accordingly, the court was required to increase his offense level by at least two steps.

■ The government's contention that the court could not properly interpret § 3B1.1 as requiring only a two-step increase, rather than a three-step increase has greater merit. In *United States v. Cotto,* 979 F.2d 921 (2d Cir.1992), a decision filed after the district court's decision in the present case, we explored the matter of whether a sentencing court has discretion as to which subsection of § 3B1.1 will be applied. We noted that some Guidelines provisions authorize intermediate offense level increases. *See id.* at 923. For example, where the defendant had a "mitigating," rather than an "aggravating" role in the offense, the Guidelines require a two-step decrease if the defendant was "a minor participant" or a four-step decrease if the defendant was "a minimal participant," and they provide that the court is to decrease the offense level by three steps for "cases falling between." Guidelines § 3B1.2. No such leeway is provided for aggravating roles. The categories of aggravation are defined in far more concrete terms, and the increase sizes provided by § 3B1.1 are adjacent integers. Thus, as we concluded in *Cotto,* with respect to the aggravating role enhancement, there is no room for a compromise; if a defendant meets the requirements for a three-step increase, the court has no discretion, in

applying the Guidelines, to limit the increase to two steps.

Here, the findings that the group supervised by Farah "certainly" included more than five participants, that the operation was otherwise extensive, and that during Hanna's absences, Farah "oversaw every phase of the operations," placed Farah squarely within subsection (b) of § 3B1.1, which required a three-step increase. Having no discretion to apply a lower subsection of § 3B1.1, the court was required, in calculating Farah's offense level under the Guidelines, to impose the three-step increase.

### B. *Departure as an Alternative*

■ The district court also indicated that if its interpretation of § 3B1.1 were impermissible, it would be inclined to grant Farah a downward departure because of his role. A departure from the Guidelines is permissible only "if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" Guidelines § 5K2.0 (quoting 18 U.S.C. § 3553(b) (1988)). A district court's ruling that a given factor was not adequately considered by the Commission is subject to *de novo* review. *See, e.g., United States v. Arjoon*, 964 F.2d 167, 170 (2d Cir.1992); *United States v. Joyner*, 924 F.2d 454, 459 (2d Cir.1991). In the present case, the court's proffered justifications for a downward departure on account of Farah's role were (a) a lack of indication of a "more significant commitment to the affairs of the organization," (b) the "fortuit[y]" and impermanence of his position "at the reins" of the organization, (c) a lack of evidence that Farah would profit more than any other participant, and (d) a low likelihood of recidivism. We conclude that these factors did not provide a basis for departure because they either were adequately considered by the Commission or were contradicted by the court's own findings of fact.

■ First, the suggestion that Farah lacked a sufficient "commitment" to the organization's affairs to be sentenced as a manager or supervisor is belied by the court's own findings. Perhaps he did not have a more significant commitment than Hanna, who was a "leader" and hence was subject to the four-level increase provided by Guidelines § 3B1.1(a); but there plainly is no requirement that a manager or supervisor, to be subjected to a three-level increase, have a greater interest than the leader. And any notion that Farah did not have a more significant commitment than members of the organization other than Hanna is belied by the court's findings that in the organization's operations Farah was "ubiquitous," was Hanna's "trusted 'right hand man,'" and was trusted "[u]nlike any other participant." Those findings and the finding that Farah confirmed his worthiness of that trust by "d[oing] everything Hanna did when she left the United States" during the spring and summer of 1987 simply do not permit a conclusion that Farah lacked more "commitment" than participants other than Hanna.

■ For several reasons, the second factor mentioned by the court, *i.e.*, the "fortuit[y]" and impermanence of Farah's running of the operation while Hanna was away, provides no sounder basis for departure. The fact that Farah was not a permanent leader of the operation does not suggest that he was less culpable than anyone other than Hanna, the permanent leader. The court found that while Hanna was away, Farah "oversaw every phase of the operations from the importation of the drugs to the laundering and transmittal of the proceeds out of the country." Plainly he was more culpable than those whose actions he controlled. Further, any "fortuit[y]" in Farah's temporary leadership role related only to the happenstance that Hanna left the country. Farah plainly was not a random choice as her substitute; rather, the court found that his selection "evidence[d] her reliance on him as a trustworthy stand-in."

Moreover, the court's findings reveal that Farah was subject to the three-level

role adjustment even if he had not led the organization while Hanna was out of the country. Those findings indicate that the ubiquitous Farah recruited and supervised at least the money launderers. Thus, though the fact that Farah was "at the reins" of the entire organization only during Hanna's absence may justify not finding him a "leader" under § 3B1.1(a), it provides no basis for refusing to give recognition under § 3B1.1(b) to his role as a "manager or supervisor (but not an organizer or leader)" in a criminal activity that involved more than five participants.

■ The court's third stated basis for departure, *i.e.*, a lack of evidence that Farah was to profit more than others, is impermissible in light of the Commission's explicit consideration of the profit factor in its commentary to § 3B1.1. The commentary states that the Commission's "primar[ ]y" concern is the defendant's "relative responsibility"; it then mentions the likelihood that persons with managerial responsibility "also" may "tend to profit more," thereby flagging one hallmark by which heightened responsibility may be recognized; and it ends with the instruction that "[t]he Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." Thus, the Commission plainly considered the profit factor and accorded it no better than secondary importance in the consideration of the degree of a defendant's aggravating role in the offense. We see no basis for a conclusion that the Commission failed to give adequate consideration to the profit factor.

■ Finally, the court's offense-level departure on the basis that Farah was not, as hypothesized by the § 3B1.1 commentary, more likely to recidivate, was not permissible. The central focus of the offense-level component of a Guidelines calculation is the nature of the defendant's conduct in connection with the offense of conviction, *see* Guidelines § 1B1.3(a); *United States v. Campbell*, 967 F.2d 20, 24 (2d Cir.1992); and as indicated above, Farah's conduct fell squarely within Guidelines § 3B1.1(b), and the conduct characteristics mentioned by

the court could not provide a basis for departure. The likelihood of recidivism, however, is a characteristic of the defendant rather than of his conduct, and the Commission intended that consideration of a defendant's propensity for recidivism should occur in connection with the calculation of, and possible departure from, his criminal history category. *See United States v. Campbell*, 967 F.2d at 24. Thus, the policy statement in Guidelines § 4A1.3 expressly permits the sentencing court to, *inter alia*, depart downward from an otherwise applicable Guidelines range where "the court concludes that a defendant's criminal history category significantly over-represents ... the likelihood that the defendant will commit further crimes." However, that policy statement goes on to state that

... Category I criminal history is set for a first offender with the lowest risk of recidivism. Therefore, a departure below the lower limit of the guideline range for a Category I criminal history on the basis of the adequacy of criminal history cannot be appropriate.

Guidelines § 4A1.3 (pre–1992 version); *see United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir.1990) (criminal history departure below category I not permissible); *see also* Guidelines as modified eff. Nov. 1, 1992 (substance of § 4A1.3 unchanged). Policy statements must be taken into account by the court in determining whether or not and to what extent the Commission has failed to consider a factor said to be a potential basis for departure. *See* 18 U.S.C. § 3553(b) (1988); *United States v. Johnson*, 964 F.2d 124, 128 (2d Cir.1992).

In light of § 4A1.3, it is clear that the Commission gave consideration to the likelihood that a defendant would not recidivate and took that into account in setting Category I for a defendant exhibiting "the lowest risk of recidivism." The Commission also anticipated and explicitly disapproved of sentencing courts' possible desire to depart below the category that already reflects the lowest risk.

Farah's criminal history category was I. Therefore, the lack of likelihood that he

would recidivate had already been taken into consideration by the Commission, and the court could not properly depart on that basis.

In sum, the court mentioned no tenable basis for an offense-level departure on account of Farah's conduct, and a criminal-history-category departure for lack of likelihood of recidivism was impermissible. Accordingly, we vacate the sentence and remand to the district court for resentencing of Farah with an offense level calculated using the three-step increase required by § 3B1.1(b).

### C. *The Money-laundering Count*

■ Finally, we note that the money-laundering offense of which Farah was convicted was committed prior to the effective date of the Guidelines, and that Farah contends that the district court erred in sentencing him under the Guidelines on that count. Though we agree that that count was not governed by the Guidelines, a remand on that ground alone would not be required since (a) Farah failed to make this objection in the district court and hence has waived it, and (b) the sentence on this count was both shorter than and concurrent to the sentence imposed on him for his narcotics offense, and hence the error was harmless.

However, since the judgment must be vacated and the matter remanded for resentencing on the narcotics count, we direct the district court to resentence Farah on the money-laundering count within the framework that applied at the time of the money-laundering offense.

### CONCLUSION

We have considered all of the parties' arguments in support of their respective appeals and have found them to be without merit except as indicated above. The judgment of conviction is vacated, and the matter is remanded for sentencing not inconsistent with the foregoing.

GEORGE C. PRATT, Circuit Judge, dissenting in part:

With the advent of the sentencing guidelines, judicial discretion has been replaced by prosecutorial discretion. *United States v. Mobley*, 956 F.2d 450, 461 (3rd Cir.1992) (Mansmann, J., dissenting) ("mechanical effect of the Guidelines * * * leaves no discretion for the district court"). Courts sentencing under the guidelines, however, are supposed to "retain an important measure of individualized discretion * * * to depart from the sentence mandated by the Guidelines." *United States v. Fernandez*, 877 F.2d 1138, 1144 (2d Cir.1989). Decisions such as the majority's belie this claim. Despite the district court's supposedly "wide discretion" to depart, *see id.*, in this case, the court's minimal downward departure based on the defendant's unusual position is overturned.

This case is not atypical of the apparent lack of judgment often revealed when inexperienced prosecutors flex their newfound power under the guidelines. *United States v. Harrington*, 947 F.2d 956, 966 (D.C.Cir. 1991) (Edwards, J., concurring) (guidelines transferred discretion from "impartial arbiters" to "less neutral parties who rarely are called to account for the discretion they wield"). Five defendants were charged with various counts of narcotics distribution and money laundering. All of them pled guilty and were sentenced to substantial terms of imprisonment. All five defendants appealed. Incredibly, rather than simply asking us to affirm, the government sought a remand for the sole purpose of increasing one defendant's offense level from 36 to 37; 15 years in jail is not enough—it must be 17 years! Even more incredibly, the majority remands.

The majority asserts that all of the factors relied on by the district court to depart "either were adequately considered by the Commission or were contradicted by the court's own findings of fact." In discussing the district court's fourth justification, Farah's low likelihood of recidivism, the majority holds that this was an impermissible basis for an offense-level departure, because the propensity for recidivism "is a

characteristic of the defendant rather than of his conduct," and that only conduct should be considered here. But this rigid categorization is unsupported by either the guidelines or the caselaw.

First, *United States v. Campbell*, 967 F.2d 20 (2d Cir.1992), cited by the majority, actually holds that some factors are proper bases for both "dimensions." *Id.* at 24–25 ("prior act is relevant to determining both the defendant's criminal history category and the offense level for the charged conduct").

Even more significantly, the guidelines themselves mention likelihood of recidivism both in the context of determining an offender's criminal history category, *see* U.S.S.G. § 4A1.3, p.s. ("likelihood that the defendant will commit further crimes"), and in the context of determining an offender's role in the offense, *see* U.S.S.G. § 3B1.1, comment. (n.3) (managers and supervisors are "more likely to recidivate"). If the guidelines consider recidivism in both contexts, why can't the district court do so as well? Moreover, while the guidelines' consideration of recidivism in the context of criminal history may be adequate, their discussion of how this factor impacts on a defendant's role in the offense is fleeting at best and thus leaves ample room for departure in appropriate cases.

The sentencing judge here noted that the guidelines' required enhancements for playing a leadership role in the offense are premised in part on the notion that leaders would be more likely to recidivate. Judge Dearie's assessment of Farah "strongly indicate[d] that Farah was less likely to 'recidivate' than most of his codefendants", and this possibility was not adequately considered by the commission. The relevant commentary focuses on offenders who are "more likely" to recidivate, not those who are less likely. In short, it was *not* "impermissible", as the majority holds, for Judge Dearie to grant this modest downward departure on the basis that Farah showed little likelihood of recidivism.

Our rejection of the district court's well-articulated reasons for this one-level downward departure simply further undermines what little discretion has been left to a sentencing judge. The guidelines nominally invite sentencing judges to depart in unusual cases, such as those "to which a particular guideline linguistically applies but where conduct significantly differs from the norm." U.S.S.G. Ch. 1, Pt. A, 4(b), p.s. We should not be discouraging district courts from accepting that invitation.

I dissent from the remand.