**UNITED STATES of America,**
Appellee,

v.

**Jeremy E. BARRETT, Defendant–
Appellant.**

No. 98–1294.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1998.

Decided June 3, 1999.

Andrew G. Tretter, McDonough, Marcus, Cohn, Tretter, Heller & Kanca, LLP, New York, NY (John L. Ponzini, Brandner & Ponzini, Stamford, CT, on the brief), for Defendant–Appellant.

David C. Finn, Assistant United States Attorney (Mary Jo White, United States Attorney, Southern District of New York, Dietrich L. Snell, Assistant United States Attorney, on the brief), New York, NY, for Appellee.

Before: WINTER, Chief Judge, JACOBS and POOLER, Circuit Judges.

POOLER, Circuit Judge:

Jeremy E. Barrett appeals from the May 27, 1998, judgment of the United States District Court for the Southern District of New York (Martin, J.) sentencing him in connection with his guilty plea to bank fraud in violation of 18 U.S.C.

§ 1344. Barrett raises several challenges to his sentence, none of which has merit. In addition, Barrett makes a collateral attack on the validity of his plea in the context of a sentencing dispute. Because Barrett's conduct and state of mind satisfied the elements of bank fraud, we do not disturb Barrett's plea.

## BACKGROUND

A one-count information filed on September 25, 1997, charged Barrett with bank fraud in connection with his six-year scheme to embezzle approximately $714,-000 from his employer, F. Schumacher & Co. Barrett pleaded guilty to the information on September 25, 1997. Barrett began working for F. Schumacher & Co. in 1981 and was the company's vice president of sales and national sales manager when he left in 1996. Between 1990 and 1996, Barrett submitted false invoices and check requests to the company's accounting department and asked that the checks be returned to him. The false invoices reflected both actual and fictitious F. Schumacher accounts, and Barrett interspersed his fraudulent check requests with legitimate payment requests. When Barrett received the checks, he forged the payee endorsement, further endorsed the check in his name or the name of his wife, and deposited the funds in a personal account he shared with his wife. Barrett therefore presented the checks with forged endorsements to a financial institution for negotiation, and the Bank of New York paid out the funds because F. Schumacher held its account there. Using this method, Barrett acquired approximately 100 false checks totaling $714,000.

After Barrett left F. Schumacher, the company discovered through internal audits that Barrett may have embezzled several hundred thousand dollars. The full extent of Barrett's crime became apparent after the Federal Bureau of Investigation ("FBI") conducted an audit and investigation. Barrett, who was represented by counsel at the time, made a full statement of confession to FBI investigators on December 13, 1996. According to Barrett, no one else was involved in his scheme, and he used most of the money to finance repairs and renovations to his house in New Canaan, Connecticut.

After conducting an evidentiary hearing, Judge Martin sentenced Barrett to 24 months imprisonment, three years supervised release, and a $100 special assessment. The court also ordered Barrett to pay restitution to F. Schumacher. Barrett now appeals his sentence.

## DISCUSSION

### I.  Standard of review

■■■ We apply *de novo* review to the legal questions regarding application of the Sentencing Guidelines. *See United States v. Jolly*, 102 F.3d 46, 48 (2d Cir.1996). We review the district court's findings of fact for clear error. *See United States v. Farah*, 991 F.2d 1065, 1068 (2d Cir.1993).

### II.  Abuse of position of trust

The district court at sentencing increased Barrett's offense level calculation by two levels pursuant to U.S.S.G. § 3B1.3 because Barrett abused a position of trust in the commission of his crime. Appellant raises three challenges to this increase. First, Barrett argues that the enhancement is erroneous because his position within F. Schumacher was outside the company's financial operations and did not allow him to write checks independently. Second, appellant contends that the Sentencing Guidelines section does not apply because the bank fraud victim, the Bank of New York, did not entrust Barrett with authority. Finally, Barrett claims that the facts of his crime do not constitute bank fraud and that the enhancement would not apply if he had been properly charged with transportation or receipt of stolen property.

■■■ The sentencing enhancement for abuse of a position of trust applies where a

defendant used his position of public or private trust "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Professional or managerial discretion characterizes the position, and people holding these jobs "ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.*, comment. (n.1). The position of trust must have "contributed in some significant way to facilitating the commission or concealment of the offense." *Id.* In addition, the defendant must have misused discretionary authority that the victim entrusted to him or that another party entrusted to him on the victim's behalf. *See Jolly,* 102 F.3d at 48. We use the perspective of the victim to determine whether a defendant was in a position of trust. *See United States v. Castagnet,* 936 F.2d 57, 62 (2d Cir.1991).

### A. Barrett's position

■ Barrett argues first that the sentencing enhancement should not apply because his job merely involved sales rather than some fiduciary position within the financial operations of F. Schumacher. Barrett states that he lacked the requisite discretionary authority because he could not issue checks independently but instead had to request them from F. Schumacher's accounting department like any other company employee. Appellant incorrectly limits Section 3B1.3 enhancements to fiduciaries because the guideline is not that narrow. For example, the enhancement has applied to defendants who were police officers, security guards, babysitters, custodians, and truck drivers. *See Castagnet,* 936 F.2d at 60–62 (citing cases). The common thread in these cases is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong" rather than a legally defined duty such as fiduciary duty. *Id.* at 61–62 (quoting *United States v. Hill,* 915 F.2d 502, 506 (9th Cir.1990)).

Moreover, Barrett's statement to authorities belies his present contention that he lacked discretionary authority at F. Schumacher to facilitate the commission and concealment of his crime. There is no question that Barrett was a higher-level manager in the company with discretionary authority, and he stated that he supervised 40 people nationwide, traveled internationally in connection with his job, and earned $160,000 annually. Importantly, even though Barrett had to request checks from the accounting department, his position at F. Schumacher facilitated his crime because he stated that his "check requests were not questioned because he was the Vice President of Sales and had the authority to authorize any check on any open account." *Statement of Def. of 12/12/96* at 3. Barrett's position also gave him access to account records and sales reports that he used to create false invoices for the check requests. Barrett was in a position with freedom to commit a wrong so difficult to detect that a company audit uncovered less than half of the stolen amount of money.

Contrary to Barrett's argument, his is not a case like *United States v. Williams,* where the Sixth Circuit held that the enhancement did not apply to an agency executive director who embezzled government funds because she committed the same crime while she was a regular, non-supervisory employee. *See United States v. Williams,* 993 F.2d 1224, 1228 (6th Cir. 1993). By Barrett's own admission, accounting department employees did not question his check requests due to his position in the company. The facts of this case easily fall within established Second Circuit precedent. *See United States v. Valenti,* 60 F.3d 941, 947 (2d Cir.1995) (holding that enhancement applied to defendant who embezzled funds from an organization of which he was treasurer because he was responsible for financial records, had sole possession of checkbook and had authority to issue checks); *see also United States v. Melendez,* 41 F.3d 797, 799 (2d Cir.1994) (hold-

ing that enhancement applied where defendant was one of several people with access to large amounts of cash without tight accounting controls). Therefore, we conclude that Barrett's position at F. Schumacher was one of private trust.

## B. Barrett's victim

■ Appellant argues second that the enhancement is inapplicable because the Bank of New York was the victim of his bank fraud and Barrett held no position of trust with respect to the bank. According to Barrett, the bank entrusted him with no special authority.

■ We utilize the victim's perspective in applying the enhancement for abuse of a position of trust. *See Castagnet*, 936 F.2d at 62. However, the definition of victim depends upon the circumstances of the case. We must examine the relationship that existed between the defendant and victim and whether it provided defendant the ability to commit the crime. *See id.* In addition, the Sentencing Guidelines recognize that there exist primary and secondary victims of fraud. *See United States v. Echevarria*, 33 F.3d 175, 180–81 (2d Cir.1994) (holding that government, insurance companies and patients were victims of defendant who posed as a doctor and fraudulently collected payments for medical services). Banks are not always the immediate victims in a bank fraud. *See United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir.1998).

In this case, Barrett's relationship with F. Schumacher enabled him to commit and conceal his crime, and the company's relationship with the Bank of New York enabled Barrett to realize cash from his fraudulent checks. Barrett's scheme took advantage of both institutions in order to embezzle funds. The district court therefore properly applied Section 3B1.3.

## C. Criminal charge

■ Finally, Barrett argues that the district court improperly accepted his plea of guilty to bank fraud because his actual crime was a lesser offense in which the abuse of trust enhancement would have been implicit. This argument essentially challenges his guilty plea, because appellant contends that his crime did not constitute bank fraud.[1] Barrett contends that pursuant to the Uniform Commercial Code ("UCC"), the Bank of New York was not exposed to civil financial liability as a result of his conduct.[2] According to Barrett, this fact forecloses a criminal conviction for bank fraud because he did not victimize the bank. We assume without deciding that appellant did not waive this argument at the time of his guilty plea and find his contention to be without merit.

■ We read the bank fraud statute "expansively." *See United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992). The well established elements of the crime of bank fraud are that the defendant (1) engaged in a course of conduct designed to deceive a federally chartered

---

1. Although he initially did not frame his argument in these terms, Barrett may be claiming a violation of Fed.R.Crim.P. 11(f). Rule 11(f) requires the district court to satisfy itself regarding the factual basis for defendant's guilty plea. The court need not evaluate evidence but must "assure itself simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir.1997). The court may rely on defendant's own admissions, information from the government, or other information appropriate to the specific case. *See id.*

2. Barrett relies on Section 3–405(1)(c) of the New York Uniform Commercial Code, which states in relevant part that "[a]n indorsement by any person in the name of a named payee is effective if . . . an agent or employee of the maker or drawer has supplied him with the name of the payee intending the latter to have no such interest." N.Y. U.C.C. Law § 3–405(1)(c) (McKinney 1998). *See also Prudential–Bache Sec., Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 539 N.Y.S.2d 699, 702, 536 N.E.2d 1118 (1989).

or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss. *See Rodriguez,* 140 F.3d at 167. The bank need not be the immediate victim of the fraudulent scheme. *See id.* at 168. In addition, the bank need not be actually victimized as long as a defendant acted with the requisite intent. *See Stavroulakis,* 952 F.2d at 694. Therefore, actual or potential loss to the bank is not an element of the crime of bank fraud but merely a description of the required criminal intent.

Barrett argues that his case is like *Rodriguez,* where no bank fraud was present, because the Bank of New York is not potentially liable for a monetary loss pursuant to the UCC. *Rodriguez* does not control the instant case. Although the panel in *Rodriguez* did mention civil liability under state law, it also noted that defendant in that case did not present forged or stolen checks for deposit and thus did not intend to victimize the bank. *See Rodriguez,* 140 F.3d at 168-69. In contrast, Barrett not only intended to defraud the bank by passing forged checks but he also engaged in a rather elaborate scheme to defraud when he obtained and cashed the checks. An essential step in Barrett's fraudulent scheme was his act of forging endorsements on the checks he obtained from Schumacher and cashing those checks at the Bank of New York. Without this step, Barrett would have realized no gain.

The key issue here is defendant's criminal intent, not the bank's civil liability. In this respect, Barrett's action of passing checks with forged signatures is significant.[3] In *Stavroulakis,* criminal liability

attached where defendant trafficked in stolen blank checks because the checks ultimately would be passed to a drawee bank over a forged signature. *See Stavroulakis,* 952 F.2d at 695 (noting that "[i]n most forgery situations, the bank will be legally liable, and, ... even in a number of those situations where the bank is not legally liable for paying over a forged signature, the bank will often swallow the loss for the customer"). In another case, criminal liability attached where defendant obtained a check from a victim under false pretenses and then deposited it in a bank after falsely representing to the bank that he had authority to do so. *See United States v. Morgenstern,* 933 F.2d 1108, 1112-14 (2d Cir.1991). These cases instruct us to look at the entire circumstances of defendant's conduct as an indication of the requisite criminal intent. Barrett's conduct of passing approximately 100 false checks totaling $714,000 over a six-year period falls within these boundaries. Additional evidence of Barrett's criminal intent lies in his admission to authorities that he deposited the fraudulent checks because he was "afraid" to cash them outright, and he used automatic teller machines and the mail to avoid bank tellers' questions.

Because Barrett's conduct satisfied the elements of bank fraud, his guilty plea was proper. We reject Barrett's implicit challenge to his guilty plea because Barrett intentionally engaged in a course of conduct designed to deceive a financial institution into releasing property.

### III. More than minimal planning

Appellant also contends that the district court erroneously increased his offense level pursuant to the specific

---

3. Despite the provisions of Section 3–405 of the UCC, banks face practical adverse consequences and potential liability problems when they cash checks over forged endorsements because banks offer standing lines of credit to their depositors and may suffer a loss, especially if the defalcations impair a depositor's credit, they may suffer a loss of customer good will, or they may be forced to litigate resulting claims. On the facts of this case, the Bank of New York faced a loss of customer good will and institutional embarrassment because the scheme victimizing the bank persisted for six years without detection. We need not decide whether some or all of these risks would be enough to support a finding of intent beyond a reasonable doubt.

offense characteristic listed in U.S.S.G. § 2F1.1(b)(2)(A) because the offense involved more than minimal planning.[4] Barrett claims that his crime involved no elaborate plans with respect to a financial institution because he merely endorsed and deposited checks. We disagree.

The Sentencing Guideline regarding fraud lists more than minimal planning as a relevant specific offense characteristic. More than minimal planning applies "in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, comment. (n. 1(f)). The enhancement applies, for example, in a case of "creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered" or "several instances of taking money, each accompanied by false entries." *Id.* The facts of Barrett's offense squarely fall within these definitions and examples because Barrett repeatedly created false invoices over a period of six years in order to accomplish his embezzlement. Even if his crime was not complex, Barrett nonetheless took "detailed and deliberate action" in committing the offense. *United States v. Walsh*, 119 F.3d 115, 120 (2d Cir.1997). As noted above, Barrett need not have directed all of his fraudulent actions exclusively at the Bank of New York. The district court therefore correctly added two levels to Barrett's sentencing calculation for more than minimal planning.

## CONCLUSION

For the foregoing reasons, Barrett's conviction and sentence are affirmed. We have considered appellant's remaining arguments and find them to be without merit.

---

4. Impermissible double counting does not occur where a court enhances a defendant's sentence for both more than minimal planning and abuse of a position of trust. *See United States v. Marsh*, 955 F.2d 170, 171 (2d Cir.1992).