UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 14, 2011 Decided: November 8, 2012)

Docket No. 10-2441-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,
Appellee,

v.

FELIX NKANSAH,
Defendant-Appellant,

KWAME GYANBAAH, DAVID DOSOO,
Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e: WINTER, LYNCH, and CARNEY, Circuit Judges.

Appeal from a conviction by a jury in the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge), for conspiring to, and filing, false claims with the IRS, bank fraud, aggravated identity-theft, and identity-theft. We affirm in part, vacate in part, and remand for resentencing.

Judge Lynch concurs in a separate opinion.

ROSS M. BAGLEY (Robert W. Ray, on the brief), Pryor Cashman LLP, New York, NY, for Defendant-Appellant.

TELEMACHUS P. KASULIS, Assistant United States Attorney (Nicholas J. Lewin & Jesse M. Furman, Assistant United States Attorneys, on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

WINTER, Circuit Judge:

Felix Nkansah appeals from his conviction after a jury trial before Judge Rakoff for: (i) conspiracy to file false claims with the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 286 ("Count One"); (ii) filing false claims with the IRS in violation of 18 U.S.C. § 287 ("Count Two"); (iii) bank fraud in violation of 18 U.S.C. § 1344 ("Count Three"); (iv) aggravated identity-theft related to the bank fraud charged in Count Three in violation of 18 U.S.C. § 1028A(a)(1), (c)(5) ("Count Four"); and (v) identity-theft in violation of 18 U.S.C. § 1028(a)(7), (b)(1) ("Count Five").

We hold that there was insufficient evidence for appellant's conviction on Count Three and that his conviction on Counts Three and Four must, therefore, be vacated. We find appellant's other arguments to be without merit but do not address his claim regarding the substantive reasonableness of his sentence.

BACKGROUND

Viewing the evidence in the light most favorable to the government, see United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008), appellant was part of a group that, beginning in early 2005 through August 2008, stole names, dates of birth, and social security numbers from foster care, hospital, and childcare databases. This information was used to file thousands of

fraudulent tax returns in the victims' names with fictitious income figures, resulting in tax refunds either sent as a check to the address of a group member or electronically deposited into a bank account controlled by a group member. The group, expecting about half the refunds to be approved by the IRS, filed for $2.2 million in fraudulent refunds and ultimately obtained $536,167. When a refund was received in the form of a check made out to an identity-theft victim, a group member would forge the payee's signature along with an endorsement over to the group member. The particular group member would deposit the check into a controlled bank account and would soon thereafter withdraw the money.

Appellant was linked to deposits at Commerce Bank, HSBC, and Bank of America. A search of his home and car revealed stolen identity information, tax refund correspondence to identity-theft victims sent to appellant's address, and a computer with a partially-completed tax refund made out in an identity-theft victim's name. Other evidence linked nearly 70 fraudulent tax returns to an IP address registered to appellant. On the same day, one of appellant's bank accounts received two federal tax refunds of several thousand dollars each. Evidence linked appellant to checks made out to identity-theft victims and endorsed over to a "William K. Arthur." These checks were deposited into a Bank of America account that appellant controlled under that name.

Appellant was arrested on September 9, 2008 and ultimately charged with the five counts described above. Count Five of the indictment for identity-theft did not include a reference to interstate commerce, an element of the crime for which he was convicted. While on bail prior to trial, appellant fled to Canada where he was later apprehended and returned to the United States. After an aborted plea deal, he was found guilty by a jury on January 29, 2010, on all five counts. He was sentenced principally to 51 months' imprisonment on each of Counts One through Three and Five to run concurrently and 24 months' imprisonment on Count Four to run consecutively to the other counts.

At trial, the government sought to show that the banks in which deposits were made by the group were at a risk of loss. Special Agent Peck of the Secret Service testified:

> When the bank transmits the funds to be collected and it comes back as not accurate or a counterfeit check or a fraudulent check, they no longer will get those funds back and they, most of the time, have already given out the funds to a payee or someone else. It is withdrawn.

He also testified that Commerce Bank suffered financial losses "for not just Mr. Nkansah himself but the combined total in the case" as a result of the scheme. However, when pressed about specific losses suffered by banks as a result of appellant's specific use of accounts, Agent Peck could not confirm that such losses occurred. He also testified that while he thought that such banks bore the loss from accepting for deposit fraudulently

obtained Treasury checks, he was “unsure” if that theory was correct.

During jury deliberations, the government inadvertently provided the jury with documents that had not been introduced into evidence. In particular, a standard form proffer agreement was included. Upon being notified of this by the government, the district court sent the courtroom deputy into the jury room, which had already been vacated for the evening, to retrieve the exhibit. It was still in the manila folder in which it had been originally housed. The folder was still inside the Redweld in which it had been given to the jury. Because of the circumstances surrounding the exhibit’s location, the court concluded that it was likely that the jury had not seen the proffer agreement. The court further found that, even if the jury had seen the proffer, it contained nothing in evidence and, in any event, nothing material to any issue not already established in the case -– usually from Nkansah’s own testimony. Other documents mistakenly given to the jury were found to be similarly duplicative of evidence already before the jury.

## DISCUSSION

We address each of appellant’s challenges in turn.

### a) <u>Bank Fraud Conviction</u>

We turn first to the sufficiency of the evidence regarding appellant’s bank fraud conviction.

We note the familiar standard that sufficiency challenges are reviewed de novo, United States v. Leslie, 103 F.3d 1093, 1100 (2d Cir. 1997), but a defendant challenging the sufficiency of the evidence bears a "heavy burden," United States v. Gaskin, 364 F.3d 438, 459 (2d Cir. 2004) (internal quotation marks omitted). Appellant's claim, however, turns largely upon the legal definition of the defendant's state of mind that must be proven for purposes of a bank fraud conviction.

The federal bank fraud statute, 18 U.S.C. § 1344, provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice --
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Appellant knowingly used deception with regard to the bank accounts he controlled: (i) he opened them in the names of other people as well as the fictional William K. Arthur; and (ii) he deposited in the accounts checks fraudulently obtained from the United States Treasury causing the bank to seek reimbursement from the Treasury. Appellant argues, however, that the government was required to prove that he intended to victimize the banks as opposed to the Treasury. He claims that there was no evidence of such an intent or even that the banks had actually

lost money. In essence, he argues that the banks were no more victims of his deceptions than a bank in which someone opens an account under a false identity to conceal funds from a spouse or business partner.

Appellant is correct that the bank fraud statute is not an open-ended, catch-all statute encompassing every fraud involving a transaction with a financial institution. Rather, it is a specific intent crime requiring proof of an intent to victimize a bank by fraud. See United States v. Rubin, 37 F.3d 49, 54 (2d Cir. 1994). "[A] federally insured or chartered bank must be the actual or intended victim of the scheme." United States v. Stavroulakis, 952 F.2d 686, 694 (1992); see also United States v. Blackmon, 839 F.2d 900, 906 (2d Cir. 1988) ("Where the victim is not a bank and the fraud does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2)."); S. Rep. No. 98-225, at 377 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517 (bank fraud Statute designed to "assure a basis for federal prosecution of those who victimize these banks through fraudulent schemes.") Therefore, convictions for bank fraud are limited to situations where "the defendant (1) engaged in a course of conduct designed to deceive a federally chartered or insured financial institution into releasing property; and (2) possessed an intent to victimize the institution by exposing it to actual or potential loss." United States v. Barrett, 178 F.3d 643, 647-48 (2d Cir. 1999).

Our concurring colleague takes serious issue with the need to prove intent to harm a financial institution, albeit he concedes that this element is well-established in our caselaw. We note only that the government has argued none of the points he makes and begins its discussion of this issue with the following statement: "The bank fraud statute was enacted to 'protect[] the financial integrity of [federally guaranteed financial] institutions, and . . . assure a basis for Federal prosecution of those who victimize these banks through fraudulent schemes.' S. Rep. No. [98-225], [at] 377 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517." Brief of Appellee at 16, United States v. Gyanbaah (Nkansah), 10-2441 (2d Cir. Apr. 13, 2011). The ensuing discussion then goes on to underline the need to prove the intent to harm a financial institution.[1]

The government had to prove beyond a reasonable doubt that appellant intended to expose the banks to losses.[2] Were that

---

[1] Our colleague notes that our opinion does not follow the literal language of the statute. We agree but also note that our colleague's construction of the statute suffers from a similar failing. Read literally, the statute would encompass a fraudulent scheme inducing a victim to write a valid check to the perpetrator who then cashes it to obtain "moneys . . . under the custody or control" of a bank. However, our colleague avoids this reading of the statute by adding an element not in the statutory language, namely, that the scheme include a lie to the bank, albeit, in his view, a lie not harmful to the bank. In contrast, the language of the statute requires only fraudulent "representations" without any requirement that they be made to the financial institution. Requiring a lie to the financial institution thus adds an element not in the statutory language that is presumably inferred from the statutory purpose. The further element of a lie intending harm to the institution, required by our decisions, is an inference drawn more accurately from that same purpose.

[2] Our concurring colleague expresses concern that this reading of the statute leaves a gap in the tools of federal law enforcement enabling many fraudsters to escape prosecution. We believe that concern to be exaggerated. The statute in question was designed to expand criminal liability beyond the wire or mail fraud statutes for persons who were also endangering the financial health of financial institutions. See S. Rep. No. 98-225, at 377-78

intent proven, the actuality, or even possibility, of losses would be irrelevant. However, there is no direct evidence of appellant's intent to victimize the banks at which he opened accounts under the name of others or the fictitious William K. Arthur and deposited fraudulently obtained Treasury checks. The government therefore relies on inferences to be drawn from two pieces of circumstantial evidence: (i) conversations between appellant and other participants in the scheme; and (ii) the actual exposure of the banks to loss as a result of appellant's deceptions, based largely on the testimony of Agent Peck.

Appellant and other participants in the scheme discussed which banks would be the least likely to detect the scheme and/or the quickest to make the proceeds from the deposits available for withdrawal. While these concerns surely support an inference of an intent to avoid detection, on this record they have no probative value as to an intent to injure the banks. A bank's detection of appellant's depositing a fraudulently obtained tax refund check would lead to his arrest whether or not the bank was

---

(1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517-18. It is hardly the case that by limiting the statute to its intended purpose -- prosecution of schemes intended to harm financial institutions -- prosecutors are left bereft of necessary authority. For an immediate example, our opinion leaves appellant's convictions for three federal felonies standing.

The present issue arises only because the U.S. Treasury is not within the statute's definition of a "financial institution." See 18 U.S.C. § 20 (listing exhaustively the entities that qualify as financial institutions for the purposes of title 18). Our decision leaves untouched the caselaw allowing a finding of intent to injure where the liability of drawee banks is clear, thereby fulfilling the congressional intent to protect banks from check-kiting schemes. See S. Rep. No. 98-225, at 378 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3518. Moreover, we leave untouched the statute's protection of banks from fraudulent practices in the securing of loans.

exposed to a loss. If the Treasury detected the fraud first, it would notify the bank, and the bank's efficiency at detection would be irrelevant. The conversations are, therefore, not probative of appellant's intent to injure the banks.

The government also relies on the banks' claimed exposure to losses resulting from appellant's scheme as circumstantial evidence of appellant's intent to victimize the banks. It relies in this regard on cases in which we have affirmed bank fraud convictions based on such exposure absent direct evidence of the defendant's state of mind. However, these cases all involved a defendant who fraudulently sought to cause a bank to pay out to the defendant some of a depositor's account in that bank, e.g., cashing a forged check, see, e.g., United States v. Crisci, 273 F.3d 235 (2d Cir. 2001); Barrett, 178 F.3d 643, or to release funds for which the releasing institution was liable, e.g. presenting a falsely certified draft, see United States v. Jacobs, 117 F.3d 82 (2d Cir. 1997). Although the rationale of these decisions is generally not elaborated, we read them to hold where the direct legal exposure to losses is sufficiently well-known, a jury may infer that the defendant intended to expose the bank to the loss.

However, the widely understood exposure of a bank in such a case is only a fact sufficient to support an inference of the requisite state of mind. Someone may well forge a check believing that only the account holder will suffer a loss. The inference is, therefore, not mandatory, but permissible. Such a

permissible inference cannot be extended to cases in which evidence of the state of mind is absent and the actual exposure of a bank to losses is unclear, remote, or non-existent. See United States v. Rodriguez, 140 F.3d 163, 169 (2d Cir. 1998) (holding that when bank had no risk of loss because it was a holder in due course and where no other evidence showed intent, a bank fraud conviction must be overturned).

In the instant matter, there is no clear, much less well-known, exposure of the banks to loss. Indeed, until alerted by the Treasury to the scheme, the banks may well have been holders in due course with the risk of loss borne entirely by the Treasury. See id.

For example, appellant opened the William K. Arthur account by providing a false passport as identification. He used the account from October 2006 through at least May 2008. From October 2007 through April 2008 he deposited several fraudulently-obtained but genuine tax refund checks each month, often withdrawing the balance soon thereafter. The tax refund checks were made out to an identity-theft victim, and appellant would forge the victim’s signature on the check with an endorsement over to William K. Arthur. Appellant would then deposit the check in the Arthur account. Some deposits were made by ATM; others by teller.

The checks were genuine Treasury checks. The signature of the final endorsee, William K. Arthur, was the authorized signature for the account and was the only signature the bank

needed to verify to take the checks as a holder in due course. There is no evidence of the Treasury dishonoring the checks or seeking reimbursement from any of the banks. Our analysis does not depend on dispositively finding that Bank of America was not exposed to risk of financial loss.[3] It is sufficient to say that there is not the well-known exposure to loss that might support a finding beyond a reasonable doubt of appellant's intent to victimize Bank of America.[4]

Agent Peck's testimony does not alter our conclusion. He testified generically that banks lose money if a check is returned and that Commerce Bank lost funds as a result of the scheme. However, he also stated that he did not know whether any banks lost money as a result of appellant's specific depositing of Treasury checks, did not know of a specific case where the Treasury dishonored a check or sought reimbursement from a bank used by appellant, and was "unsure" of whether a bank was exposed to reimbursing the Treasury for accepting such checks. Such

---

[3] We have recognized that banks can sometimes suffer various reputational or other indirect harms that will satisfy bank fraud's intent element even if they are a holder in due course. See Barrett, 178 F.3d at 648 n.3 (recognizing that "banks face practical adverse consequences and potential liability problems when they cash checks over forged endorsements because . . . they may suffer a loss of customer good will" or "institutional embarassment.") In the cases where these nonpecuniary harms are recognized, the holder in due course is also the drawee's bank, and enforcing the holder in due course status against the drawee could negatively impact the bank's relationship with its drawee customer. See id. In the present matter, there is no evidence, or argument by the government, that any bank was at risk of any such loss.

[4] Appellant was associated with similar schemes at other banks, but as is the case in the Bank of America scheme, there was no evidence that these banks were exposed to risk of loss.

murky testimony cannot establish a sufficiently well-known exposure to loss by a bank to prove appellant's intent to victimize banks beyond a reasonable doubt.

Therefore, appellant's conviction on Count Three must be overturned.[5] As a consequence, his conviction on Count Four for aggravated identity-theft, which required the use of identity-theft in connection with bank fraud, must also be overturned.

b) Extrinsic Evidence Provided to Jury

Appellant next challenges his convictions on the ground that "highly incriminating extrinsic material" -- his proffer agreement -- was sent to the jury room during deliberations. He argues that the district court should have held an evidentiary hearing to determine the impact on the jury. However, appellant not only failed to ask for such a hearing but also agreed with the district court's handling of the issue. We, therefore, review only for plain error. To establish plain error, appellant must show

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness,

---

[5] The government also argues that appellant could have been convicted for bank fraud as an aider and abettor. However, the court's jury instructions on aiding and abetting liability were given only on an unrelated count. Therefore, aiding and abetting could not have been a basis for appellant's bank fraud conviction. See Napier v. United States, 159 F.3d 956, 960 (6th Cir. 1998).

> integrity or public reputation of judicial proceedings.

United States v. Marcus, 130 S.Ct. 2159, 2164 (2010) (alteration in original) (internal quotation marks and citations omitted). Trial courts have “wide discretion in deciding how to pursue an inquiry into the effects of extra-record information,” United States v. Hillard, 701 F.2d 1052, 1064 (2d Cir. 1983), and “the trial judge’s conclusions regarding the effect of the extra-record evidence on the jury are entitled to substantial weight,” United States v. Hansen, 369 Fed. Appx. 215, 216 (2d. Cir. 2010) (citing United States v. Weiss, 752 F.2d 777, 783 & n.2 (2d Cir. 1985)).

There is no plain error. The district court determined that the mistaken submission of the proffer agreement did not affect appellant’s substantial rights. The basis for that conclusion was that it was highly likely the jury did not view the proffer agreement before it was recovered and that, even if seen by the jury, its contents were either immaterial or already on the record and therefore harmless. We agree.

c) Omission of Interstate Commerce Element from Identity-Theft Count

Appellant next argues that omission of the requisite interstate commerce element from the indictment on Count Five for identity-theft, see 18 U.S.C. § 1028(a)(7) & (c), requires reversal of that conviction. We review such an omission for “constitutional infirmities, most notably whether the alleged

defect offends the Sixth Amendment right of the accused to be informed of the charges against him, the Fifth Amendment right not to be prosecuted without indictment by grand jury, or the Fifth Amendment protection against double jeopardy." United States v. Wydermyer, 51 F.3d 319, 324 (2d Cir. 1995) (citations omitted). When, as here, the argument is raised only after trial, "we interpret the indictment liberally in favor of sufficiency, absent any prejudice to the defendant," id., and require "a clear showing of substantial prejudice to the accused -- such as a showing that the indictment is so obviously defective that by no reasonable construction can it be said to charge the offense for which conviction was had," id. at 325 (quoting United States v. Thompson, 356 F.2d 216, 226 (2d Cir. 1965), cert. denied, 384 U.S. 964 (1966)). We have consolidated these elements into a requirement that the omission is reversible only for plain error, the standard of which is discussed above. United States v. Cotton, 535 U.S. 625, 631 (2002); United States v. Doe, 297 F.3d 76, 81-82 (2d Cir. 2002).

Even if omission of the interstate commerce language constitutes error that is plain, it did not impact appellant's substantial rights. When "notice adequate to allow [a defendant] to prepare a defense" is provided, omissions in the indictment do not affect substantial rights. Doe, 297 F.3d at 88 n.12. At least ten days before trial, the government submitted proposed jury instructions in which the issue of interstate commerce was specifically discussed with reference to the identity-theft

count. Appellant’s counsel neither objected to the proposed instruction nor expressed surprise at the interstate commerce language’s inclusion. Even if this were the first time appellant’s counsel became aware of the interstate commerce element, he had adequate time to address it before trial or to ask for additional time. There was therefore no harm to appellant’s substantial rights.

Nor can appellant prevail on his argument that “[a] defendant is deprived of his right to be tried only on the charges returned by a grand jury when an essential element of those charges has been altered.” When there is “overwhelming” evidence in support of the missing indictment element, the grand jury surely would have found the missing element, and the right to be tried on only charges returned by the grand jury is not violated. Cotton, 535 U.S. at 633. The evidence of appellant engaging in interstate commerce via the internet in support of the identity-theft is overwhelming. For example, IP addresses registered to appellant were used to prepare fraudulent tax returns.

d) Unreasonableness of Sentence

Finally, appellant argues that his sentence is unreasonable because of: (i) procedural unreasonableness in the district court’s failure to use an “actual loss” measure –- $536,167 –- rather than a modified intended loss measure -- over $1 million; and (ii) substantive unreasonableness because his sentence of 75 months was much greater than that of his co-defendants.

Sentences are reviewed for procedural and substantive unreasonableness using a deferential abuse-of-discretion standard. See Gall v. United States, 552 U.S. 38, 46 (2007). Issues of law are reviewed de novo, issues of fact are reviewed for clear error, and mixed issues of law and fact are either reviewed de novo or for clear error depending on whether the question is predominantly legal or factual. See United States v. Thorn, 446 F.3d 378, 387 (2d Cir. 2006).

With regard to the claimed procedural unreasonableness, the Sentencing Guidelines provide that district courts are to use the greater of actual or intended loss. See U.S.S.G. § 2B1.1, cmt. n.3(a). It was therefore not error for the district court to use intended loss, even if this number was greater than actual loss. Furthermore, a district court "need only make a reasonable estimate of the loss" given the "available information." U.S.S.G. § 2B1.1, cmt. n.3(c). Appellant and his co-conspirators filed returns totaling $2.2 million, but a co-conspirator testified that about half the claims were expected to be rejected by the IRS. Therefore, an intended loss figure of over $1 million is not clear error, because it was reasonable to find that appellant expected half of the $2.2 million in filed returns, or $1.1 million, to succeed.

We need not address appellant's substantive unreasonableness argument at this time because the convictions on Counts Three and Four must be vacated and resentencing is required. Nevertheless, we note for purposes of future proceedings that several factors

support a sentence for appellant that is in considerable excess of those of his co-defendants.  Appellant went to trial, whereas his co-defendants agreed to plea deals.  Also, appellant fled the country while on bail before trial, and, during the trial, he repeatedly lied.  A significant disparity between appellant’s and his co-conspirators’ sentences is, therefore, to be expected.

## CONCLUSION

For the foregoing reasons, we vacate the convictions on Counts Three and Four and remand for resentencing.  Otherwise, we affirm.

GERARD E. LYNCH, *Circuit Judge*, concurring in part and concurring in the judgment in part:

I join fully in all of Judge Winter's thoughtful opinion for the Court except for part (a) of the discussion, addressing the sufficiency of the evidence supporting appellant's bank fraud conviction. As to that section, I concur in the result, agreeing that reversal is required by our prior holdings. I write separately, however, to express my view that those prior decisions are predicated on an unwarranted and unwise judicial injection of an offense element that has no basis in the statute enacted by Congress. As a result, our Court finds itself on the wrong side of a disagreement among the Courts of Appeals on the mental state necessary to sustain a federal bank fraud conviction.

Felix Nkansah conceived and executed a plan to steal money by lying to the United States government and to various banks. The plan proceeded in two steps. First, Nkansah and his co-conspirators stole personal information from real people and, using that information, submitted tax returns in their names to the Internal Revenue Service with falsified income and address information. As a consequence, he and his confederates received refund checks from the federal Treasury, made out to the payees in whose names they had filed the returns. Second, by presenting forged identification documents, Nkansah opened accounts in the names of the payees at several federally insured banks, deposited the Treasury checks into those accounts by falsely endorsing them in the names of the payees, and withdrew the proceeds from the accounts. The second step was of course crucial to Nkansah's scam: he was not interested in collecting

Treasury checks to mount on the wall; the checks were of value to Nkansah only to the extent he could negotiate them.

When the scheme unraveled, Nkansah was indicted for (among other offenses) violating 18 U.S.C. § 1344. That statue provides:

> Whoever knowingly executes, or attempts to execute, a *scheme or artifice* –
>
> (1) to defraud a financial institution; or
>
> (2) *to obtain any of the moneys*, funds, credits, assets, securities, or other property owned by, or *under the custody or control of, a financial institution*, by means of *false or fraudulent* pretenses, *representations*, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Id. (emphasis added). On a plain reading of the second section of the statute, one would think it fits Nkansah's behavior like the proverbial glove. He devised a *scheme* to *obtain money* from the banks at which the accounts were opened by making *false representations* to them, and obtained cash that had been in the banks' hands – "*under [their] custody or control*." Indeed, the naive reader would think that the statute's drafter had carefully worded the second section to avoid creating any technical issues about whether the money that a fraudster obtained actually *belonged* to the bank, or whether the bank itself would suffer a financial loss; the crime is committed when a person schemes to lie to a bank (as Nkansah did, by representing himself to be another person when opening an account in that person's name and endorsing a check payable to that person), and thereby obtain funds that had been in the bank's custody and control (as Nkansah did,

by obtaining a credit in the false account and withdrawing the funds thus made available in the form of United States currency that had been under the bank's control). Whether the money paid out to the scammer belonged to the bank, or an account holder against whose account the check was drawn, or a correspondent bank, or the drawer of a check against an account at some other bank should make no difference: under the plain words of the statute, if the defendant lies to a bank to get cash that is held by the bank, he would seem to run afoul of the law, regardless of whether it is that bank or some other party that ultimately bears the loss.

The majority rules today, however, that the naive reader is wrong, and that Nkansah did *not* violate § 1344, because (1) the statute incorporates a requirement that the defendant have an intent to harm *the bank that he deceived into paying him*, and (2) there is insufficient evidence that Nkansah had that intention. The naive reader would, I suppose, react differently to these two propositions. The first proposition – the legal assertion that intent to harm the bank is required – seems unwarranted, since no such requirement appears in the language of the statute. To the contrary, as discussed above, the statute's second section would appear to be written to *avoid* imposing such a requirement. If the statute were limited to the first section, and simply prohibited defrauding banks, this reading would be understandable, though hardly inevitable. "[T]o defraud a financial institution," id. § 1344(1), could well be read as meaning to harm the bank by taking *its* money. But the alternative language, "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution," id. § 1344(2), contains no such implication.

The second proposition, on the other hand – the factual assertion that Nkansah was not proven to have such an intent – seems only too obviously true. Whether or not the scheme actually inflicted loss on the bank at which he opened the accounts and negotiated the checks, it is hardly likely that a fraudster like Nkansah, who concocts a scheme for cashing forged or fraudulently obtained checks, harbored any animus against that particular bank, or cared whether the losses from his scheme fell on the bank that cashed his check or on the account holder against whose account the check is written – a result that, under the Universal Commercial Code, depends on the precise nature of his scheme. His intent is to profit – "to obtain any of the moneys, funds, credits, assets, securities, or other property" – not to inflict loss on any specific victim. Once it is decreed that an intent to harm the *bank* is a requirement of the statute, it would seem not only that some sorts of schemes are categorically beyond the reach of the statute (a result the majority acknowledges), but also that, if the requirement is taken seriously by judges and juries, and not evaded by some dubious improvised inferences, almost no fraudulent check-cashing scheme could successfully be prosecuted.

In fairness to today's majority, they did not invent this requirement. As demonstrated by Judge Winter's opinion, this Court has previously adopted the rule that an intent to harm the bank is a required element of a violation of § 1344. The root of the rule seems to be United States v. Blackmon, 839 F.2d 900, 904-07 (2d Cir. 1988), our first case to interpret § 1344 after its 1984 enactment. There, relying in large part on legislative history, this Court held that "[w]here the victim is not a bank and the fraud

does not threaten the financial integrity of a federally controlled or insured bank, there seems no basis in the legislative history for finding coverage under section 1344(a)(2)." Id. at 906.[1] It is because of these cases, including especially United States v. Laljie, 184 F.3d 180 (2d Cir. 1999), that I concur in the judgment vacating the bank fraud conviction, as I agree that the result reached by the majority is compelled by our precedent.

Even so, Blackmon makes clear that the requirement of an intent to harm a bank has been from the start a judicial construct, not expressed in or even suggested by the statutory language. For judges to impose such a requirement without textual basis demands a strong policy rationale – indeed, a rationale so powerful that we can only conclude that Congress *must have* intended the requirement to be part of the statute, and omitted specific language incorporating it inadvertently, or because it is so obviously required as a matter of well-understood principle that it truly goes without saying. Cf.

[1] In Blackmon itself, this language is arguably dictum, as it is much broader than necessary to resolve that case, which involved a somewhat different problem than that at issue in this case. In Blackmon (unlike this case), the scheme involved no misrepresentation to a bank, and the schemers did not obtain any money directly from a bank. Rather, the scheme involved a face-to-face con game intended to fleece individual victims. Those victims obtained the money that they entrusted to the fraudsters by withdrawing it, perfectly legally and without making any false representations, from their own bank accounts. See 839 F.2d at 902 n.2 (quoting the district court's description of the scheme). The problem was not merely that there was no intent to harm the bank in question – there was no conduct directed at or involving a bank at all. The result in Blackmon, it seems to me, was entirely correct; it cannot be bank fraud to deceive an individual into turning over her cash, simply because the victim had to get the cash from a bank. In this case, however, Nkansah and his colleagues got their money illicitly *from the bank* by making false statements *to the bank*. Blackmon thus does not control the result in this case.

Morissette v. United States, 342 U.S. 246, 261-62 (1952) (finding unexpressed requirement of criminal intent implicit in 18 U.S.C. § 641 "in the light of an unbroken course of judicial decision in all constituent states of the Union holding intent inherent in this class of offense, even when not expressed in a statute").

A judicially imposed requirement of intent to harm the bank would be a plausible example of such a compelling policy if it served to distinguish criminal from non-criminal behavior, as it does under 18 U.S.C. § 656, which covers various crimes against banks by their employees. But as applied in cases like this one, the requirement merely muddies the waters – or, as in this case, improperly exonerates a defendant of bank fraud – because in such cases it is clear that the defendant has perpetrated a crime, even though it may not be clear that the bank itself has sustained loss, or that the defendant understood or hoped that it would.

Under § 656, covering theft, embezzlement, and misapplication of bank funds by a bank officer or employee, we have insisted – without any express statutory language to guide us – that an intent to harm the bank be proven in order to sustain a conviction. That insistence is motivated in part by the drafting history of § 656: an express textual requirement of such an intent was edited out of the statute by a "technical" amendment, and we have kept it in order to preserve the substance of the prohibition. See United States v. Lung Fong Chen, 393 F.3d 139, 145 (2d Cir. 2004). But in misapplication cases, the requirement is also necessary to distinguish criminal from innocent conduct. For example, in United States v. Cleary, 565 F.2d 43, 45-47 (2d Cir. 1977), we vacated a

misapplication conviction because, although the defendant had violated internal bank rules in making a loan to a third party, the district court erred by excluding evidence that the loan recipient intended to repay the loan, which might have established that the defendant had not intended to harm the bank, but had instead just broken the bank's rules by making a risky loan. There was no evidence that the Cleary defendant had received bribes or kickbacks in exchange for making the loans, or otherwise engaged in furtive or illegal behavior, further suggesting that he had not had a wrongful intent. Id. at 47. See also United States v. Docherty, 468 F.2d 989, 995 (2d Cir. 1972) (overturning a conviction under § 656 because of insufficient evidence of intent), abrogated on other grounds as recognized in United States v. McElroy, 910 F.2d 1016, 1025 (2d Cir. 1990); United States v. Evans, 42 F.3d 586, 589-91 (10th Cir. 1994).

In such cases, we have properly enforced the missing intent requirement of § 656 in order to distinguish criminal from innocent behavior. A bank officer may sidestep or ignore bank rules, perhaps in exchange for a kickback or bribe, to facilitate a loan that the borrower has no intention, or no plausible prospect, of repaying. When the loan is a sham, harm to the bank is likely; the schemers have a criminal intent to obtain money wrongfully, at the expense of the bank. In other cases, however, a bank officer may evade the bank's internal rules in the good-faith belief that the borrower is willing and able to repay, and that the loan, though not authorized by the bank's formal loan guidelines, will actually be profitable for the bank. (In some cases, indeed, the bank officer defendant may even claim that, regardless of the bank's overt rules, the bank's

management winked at or even encouraged lending supported by borrower representations that were inaccurate.) Such a banker may have violated his employer's rules, and may even have engaged in deceptive conduct, but he lacks criminal intent and therefore has not committed the crime defined in § 656.

Thus, to distinguish overly generous bankers from criminals, we properly hold under § 656 that criminal intent is shown only if the defendant had an intention to harm the bank. The formulation works in such cases because the essence of a wrongful intent in these situations is the intent to *harm* someone, and the only victim involved is the bank. The function of the rule is to separate criminals, who intend to inflict injury on another for gain, from persons who engage in deception in the good faith-belief that no one will suffer any loss. To be guilty of fraud in these circumstances, a defendant must intend not only to *lie to* the bank, or to apply its funds in an unauthorized way, but also to *harm* the bank. I have no quarrel with the proposition that a criminal intent to effect harm on *someone* is an element of a violation of § 1344 as well; it is inherent in the idea of a "scheme or artifice."[2]

---

[2] Such a rule could find application under § 1344 as well. If, in a case like Cleary, while participating in a course of conduct to obtain money under the bank's control – loan proceeds – from the bank, the bank officer makes or aids the borrower to make a false representation to the bank, the officer might be prosecuted under § 1344 as easily as under § 656. I agree that in such a case, the absence of a criminal intent to harm *anyone* would be a defense; if the officer believed in good faith that the misrepresentation was innocently intended to further a transaction that would in the end benefit the bank, he or she would lack any criminal intent. But the critical fact is the absence of an intent to *harm*. A case such as the present one, in which the defendant has a malicious intent to steal, and the defense is that he lacked an intent to harm the *bank* because he neither knew

But our cases have not deployed the "intent to harm the bank" under § 1344 to distinguish criminal from non-criminal conduct, and an "intent to harm the bank" requirement certainly serves no such purpose in this case. There is no doubt that Nkansah had a criminally fraudulent intent. His goal was to get money to which he was not entitled, with no intention of paying it back. He obviously knew that, to produce his intended enrichment, someone would bear an unjustified loss. There is no doubt that Nkansah executed a scheme to obtain funds from the various banks by making false representations with criminal intent. The majority nonetheless applies the formulation, as we have done in prior cases, to require an intent to harm the *bank*. Here, the "intent to harm the bank" test distinguishes not between criminal and non-criminal conduct, but between (1) criminal conducted specifically intended to affect a bank, and (2) criminal conduct directed at a bank and for the purpose of obtaining money wrongfully from the bank by lying to the bank, but without regard for whether the bank or someone else will bear the brunt of the crime. In effect, the majority's application expands the mens rea requirement by attaching it not only to the element of *harm* that delimits criminality, but also to the *jurisdictional* element of the statute, where it serves no such purpose.

The requirement of a *wrongful* intent, as in the bank officer cases under § 656, is an appropriate instance of judicial implication of an unexpressed mental element into a statute, because the requirement of mens rea is so fundamental to our concept of criminal

---

nor cared where the ultimate loss would fall, presents an entirely different issue.

law that courts frequently read it into statutes in the absence of an express requirement. See, e.g., Staples v. United States, 511 U.S. 600, 619-20 (1994); Morissette, 342 U.S. at 250-63. There is no such tradition with respect to jurisdictional elements, however, because for the federal government to exercise its criminal powers over an individual, it is not logically necessary for that person to know or intend that she is transgressing a particularly *federal* interest.

A good example is United States. v. Feola, 420 U.S. 671 (1975), dealing with assault on a federal officer. In that case, the Supreme Court held that an intent *to commit an assault* was a required element of the offense of assaulting a federal law enforcement official under 18 U.S.C. § 111; that was the element that made the conduct wrongful. But the Court also held that it was not necessary to prove that the defendant intended to assault, or even knew he was assaulting, a law enforcement officer – let alone a *federal* officer, the element that subjects the crime to federal jurisdiction. See id. at 684-86. Intentional assault, of anyone, is wrongful; that the victim happens to be a federal official creates federal legislative jurisdiction but does not make the act any more or less culpable.[3]

---

[3] It is not universally the case that no culpability requirement at all attaches to jurisdictional elements. For example, it has been held that under the mail (and wire) fraud statutes, the use of the mails (or wires) must have been at least reasonably foreseeable. See, e.g., United States v. Maze, 414 U.S. 395, 399 (1974). But even in such cases, courts do not require a specific intent to use the mails. As we recognized in Blackmon, "This court has unambiguously held that there is no *mens rea* requirement as to the purely jurisdictional element of interstate communication under the wire fraud statute." 839 F.2d at 907, citing United States v. Blassingame, 427 F.2d 329, 330-31 (2d Cir. 1970). In

One could, of course, argue – as the majority suggests this court did in Blackmon, 839 F.2d at 904-07 – that Congress, concerned about crime that could harm the solvency of federally insured banks, chose to punish only crimes specifically directed against such institutions. But this supposed policy choice would make little sense.[4] As with assault on federal officers, the protection of persons or institutions of special concern to Congress would be incomplete if it did not extend to harm inflicted by malicious individuals who did not know or care whether the harm they intended would fall on such a person or institution. Just as a criminal trying to shoot his way out of an arrest may not know or

---

any event, there is little reason to require mens rea with respect to purely jurisdictional elements, and the omission of such an element is the preferable rule. See National Commission on Reform of Federal Criminal Laws, Study Draft of a New Federal Criminal Code § 204 cmt. (1970) ("Since jurisdiction is only a question of which sovereign has the power to punish certain harmful conduct, it follows that, in general, the degree of an offender's culpability does not depend upon whether he does or does not know when he commits the offense which sovereign will be able to prosecute him."); id. § 204 (as part of draft proposal, "[e]xcept as otherwise expressly provided, culpability is not required with respect to any fact which is solely a basis for federal jurisdiction").

[4] Blackmon appears to have made the same mistake that the majority does today. That case cited legislative history indicating that Congress was concerned with the expanding scope of the wire and mail fraud statutes, and on that basis read § 1344 narrowly. See 839 F.2d at 906. But the legislative history cited in that case makes clear that in being cautious about the expansive scope of mail and wire fraud, Congress was concerned that "due process and notice argue for prohibiting such conduct [bank fraud] explicitly, rather than through court expansion of coverage." Id., quoting H.R. Rep. No. 901, 98th Cong., 2d Sess. 4 (1984). That is a concern about notice, not federal jurisdiction. Nothing in the legislative history cited in Blackmon, and nothing I have been able to find, specifically addresses the situation before us in the present case, or suggests – much less makes clear – that Congress intended to require a specific intent to inflict financial loss on a bank when a person obtains money from a bank by lying to the bank in connection with a criminal scheme to obtain money to which he has no claim of right.

care that the officer he is shooting at is an agent of a federal, rather than a state, law enforcement agency, so (as in this case) a criminal seeking to get money from a bank by lying to the bank may not (and typically will not) know or care whether the ultimate loss will fall on that bank, on another bank, or on an account holder. The legislative history cited by the majority is not to the contrary. That history shows that Congress enacted § 1344 because of the "strong federal interest in protecting the financial integrity of [federally insured financial] institutions." S. Rep. No. 98-225, at 377 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3517. But the fact that this interest motivated Congress to adopt the statute, and provided the jurisdictional nexus for the federalization of this class of crimes, does not imply that Congress intended the scope of the prohibition to be limited to conduct that threatened the federal interest that motivated its enactment. If Congress had so intended, it presumably would have limited the statute to major frauds, and would not have covered the various minor check frauds that are a cost of doing business for banks and in no way threaten their financial integrity.

In any event, an "intent to harm the bank" requirement does not well serve the Congressional interest in protecting federally insured banks. The government cannot adequately protect federally insured banks from loss without being able to prosecute criminals who, while undertaking schemes to obtain property under the control of such banks, are ignorant of or insouciant about whom they will harm. A check fraud that is *intended* to harm a bank may in the end impose no costs on the institution if the schemer misunderstands who will be responsible for the loss, while one that the perpetrator

*believes* will damage only some other party may in fact leave the bank liable for the loss. The goal of protecting federally insured financial institutions from loss may require a prohibition that extends more broadly than merely to crimes that are specifically intended to impose such loss.

Moreover, given the difficulties of proving such intent, injecting such a requirement will make it difficult to prosecute crimes that Congress surely would have wanted to cover. Indeed, if the majority's rule were applied seriously by judges and juries, prosecutions for bank fraud in all cases involving checks would be very difficult. Very few criminals passing checks that variously involve forged payee endorsements, forged drawer signatures, stolen or fraudulently obtained checks, and the like, who quite clearly have the specific intent to wrongfully obtain money that is in the bank's custody or control, have any knowledge of the rules of law that govern who bears the risk of loss in the complex system by which negotiable instruments are paid. Still less do most of them care. The Hollywood version of Clyde Barrow may have asked, while robbing a bank, whether cash was the bank's or still belonged to the would-be depositor, and left it to the poor farmer when told it was his.[5] It is doubtful whether the real Barrow, or any

---

[5] See the script to the film *Bonnie and Clyde* (Warner Brothers/Seven Arts 1967), available at http://www.imsdb.com/scripts/Bonnie-and-Clyde.html:

> Cut to CLYDE standing near the door, training his guns on the entire bank. A farmer stands a few feet away, some bills clutched in his hand.
>
> > CLYDE: That your money or the bank's?
> > FARMER: Mine.
> > CLYDE: Keep it, then.

Id. at 62.

other actual bank robber, has ever been so scrupulous. To say the least, persuasive evidence of an intent to harm the bank will be hard to come by.

The majority tries to avoid this reality by suggesting that in some cases an intent to harm the bank can be reasonably inferred where the law provides that the bank *will* bear the loss, and the rule of law is "well-known" or "widely understood." See Maj. Op. at 10-11. The majority provides no empirical evidence that *any* rule of law governing the payment system is "well-known" to (let alone "well understood" by) anyone but a small cadre of bankers, banking lawyers, and law professors who teach courses in negotiable instruments.[6] That the Uniform Commercial Code places the risk of loss in some check frauds on the bank that accepts the check provides no genuine basis to infer that the criminal depositing the check knew (let alone specifically intended) that the bank paying the check would bear the loss, any more than the fact that the law would hold the bank harmless as a holder in due course implies that the scammer knew that the injury would *not* fall on the bank.

---

[6] It is my strong intuition that most ordinary citizens, confronted with the facts of this case, or of the converse case, in which the majority would apparently permit conviction, in which a criminal forges the signature of an account holder on a check stolen in blank and presents the check to the drawee bank, would have the slightest idea whether the bank is liable as a matter of law for paying on the check. (I admit that I have no empirical evidence for my intuition, either, but I doubt that the majority would like to put the thesis to a test by giving a short quiz to next week's jury venire.) Indeed, in this very case, the government called a witness from the Federal Bureau of Investigation, Agent Peck, who testified that the banks would be at risk of loss, but later admitted that he was unsure whether any bank had ultimately borne any loss in this case. That a government agent charged with responsibility for investigating suspected violations of § 1344 could offer only such "murky testimony," Maj. Op. at 13, suggests that verdicts should not be made to turn on inferences from supposedly "well-known" or "well understood" rules of loss allocation.

A cynic might contend that so long as judges will enforce today's rule by allowing an inference of anti-bank animus drawn from rules of banking law to defeat motions for acquittal for insufficient evidence, prosecutors can safely charge bank fraud in cases in which the bank would in fact bear a risk of injury, and juries can be counted on to convict defendants who are shown to have engaged in clearly wrongful conduct, without worrying much about whether those defendants had actually been proved beyond a reasonable doubt to have actually intended a loss to the bank. It is perhaps true that few defendants would be so bold as to argue to a jury, "I intended to defraud, but I hoped and thought that the victims would be the bank's customers, not the banks." I am not cynical, however, about jurors' ability and inclination to follow their instructions and base their verdicts on the law and the evidence, and therefore assume that many jurors will have a reasonable doubt about the dubious proposition that the defendant in fact knew or intended that the bank to which he lied, rather than some other party, would bear the cost of his scheme. But even if I thought otherwise, I would still think it an odd legal system that defined liability rules that could only be practicable on the theory that judges and juries will take short-cuts in applying them.

The mischief of the rule is limited in this case. Because the loss from Nkansah's scheme was ultimately borne by the federal Treasury, he was convicted of a separate and equally serious crime that was also charged in the federal indictment. The principal practical consequence for him is the reversal of the additional mandatory consecutive sentence for aggravated identify theft, which by law must be piled atop a sentence for

bank fraud, but is not added to a tax fraud sentence. Some may mourn the elimination of the additional punishment; others may think the additional mandatory sentence excessive and be glad to see it reversed; either way, Nkansah will not avoid a significant penalty for his criminal acts.

In other cases, the requirement of a specific intent to injure a bank may have more serious consequences, making federal prosecution of some fraudulent check schemes impossible. Worse, the distinction between those that are and those that are not subject to prosecution under § 1344 is entirely arbitrary.

One need not invent hypothetical examples to illustrate the arbitrariness of the rule. United States v. Laljie, the case that in my view controls this one and compels my concurrence in reversing Nkansah's bank fraud convictions, amply demonstrates the point. In Laljie, the evidence permitted the jury to find the defendant, who was secretary to one Schmeelk and had access to his checkbook, stole money by (1) physically altering checks, made payable to Cash and signed by Schmeelk, to increase the amounts, pocketing the difference between the amounts Schmeelk expected and the amount the bank paid, and (2) taking checks that Schmeelk had pre-signed in blank for payments to vendors, and writing in as payee a company controlled by her husband, thus diverting the funds to her own use. We upheld convictions on bank fraud counts based on the altered-amount checks, on the theory that because the bank should have noticed the physical alterations on the checks, the bank would be liable to Schmeelk for paying the increased amounts. 184 F.3d at 190-91. Apparently crucial to the holding was the fact that the

alterations "were sufficiently visible to call into question the checks' authenticity, putting the bank on notice that the maker might have a defense against it and preventing the bank from enjoying the status of holder in due course." Id. at 190. But we vacated the convictions based on the second scheme, because the bank would not be liable for paying an apparently legitimate check that bore Schmeelk's actual signature. Id. at 191. With respect, this makes little sense. In my view, Laljie was equally guilty of violating § 1344 for both schemes, because in each case she made false representations to the bank (misrepresenting the amounts of the checks in the first scheme and misrepresenting that the checks had been made payable by Schmeelk to the payee she had fraudulently inserted in the second[7]), as part of a scheme to obtain funds under the bank's custody and control to which she had no lawful claim. A court that took seriously the rule that a conviction under § 1344 requires proof beyond a reasonable doubt that the defendant actually intended harm to the *bank*, as opposed to intending to profit himself at the expense of whoever winds up taking the hit, should have trouble sustaining the conviction in either scheme, because there is no real reason to think that Laljie had any idea whether the bank would bear the loss for any of the fraudulent transactions if Schmeelk eventually

[7] In Laljie, there is a plausible argument that in depositing the checks payable to the husband's company into an account of that company, Laljie made no misrepresentation to any bank. But no such argument can be made by Nkansah. He deposited the checks into accounts fraudulently opened, presumably by the presentation of forged identification, in the names of the persons whose identities had been hijacked in the underlying fraud on the Internal Revenue Service. There is thus no doubt that Nkansah made multiple misrepresentations to the banks to whom the checks were presented.

discovered the abuse of his account (still less that she actually intended to harm the bank). Moreover, the clear implication of the opinion – that Laljie was only guilty of bank fraud in the case of the altered checks because her forgeries were so crude that the bank should have noticed them – is totally incomprehensible. Presumably, Laljie intended her forgeries *not* to be noticed by the bank, and if she had altered the amounts in such a way that the bank was not on notice of the alterations, the bank might not have been liable to Schmeelk, and the artificial chain of inferences from actual liability of the bank to the intent of the larcenous secretary would be broken. This makes no sense: the skill of the forger should not determine whether the thief is guilty of bank fraud.[8]

However unfortunate the consequences of today's decision might be, I agree that, given Laljie and, to a lesser extent, the dictum in Blackmon, its outcome is required by the law of this Circuit. Nonetheless, I believe that this decision reverses a well-deserved

---

[8] There are many variant scenarios in which fraudsters deceive banks using false, forged, fraudulently obtained, or stolen checks. A scammer may steal blank checks and forge the account-holder's signature; create false checks that appear to be legitimate checks drawn on an actual account; present fraudulently created checks that are based on entirely fictitious accounts; forge the endorsement on a legitimate but stolen check made payable to a third party; alter the name of the payee or amount on a stolen check; and many more. In any of these cases, the criminal may present the check to the drawer's bank or to another bank, and may deposit the check into her own account or into an account in a fictitious name or in the name of an actual person to whom the check was drawn, that the con artist opened using false identification. The forgeries in any of these cases may be clumsy or skillful. I leave it to the reader to work out in which if any of these instances the bank to whom the check was presented, or any other bank, is liable for paying on the check, whether any of the rules that determine the result are "well-known" or "well understood" by anyone but a banker or bank lawyer, and whether, under the rule of our Circuit, a defendant charged with bank fraud in any of these variant instances can be found by a jury to have intended a loss to the bank.

conviction, and perpetuates a potential loophole that could make future prosecutions more difficult. The precedents upon which the Court relies today ignore the statute's plain language and are unsound as a matter of policy.

Although § 1344 has produced much litigation in the Circuits and many separate opinions by learned appellate judges, federal courts do not agree on the mental state necessary to support a conviction under § 1344, nor on the relationship between the statute's two subsections. See, e.g., United States v. Staples, 435 F.3d 860, 866-67 (8th Cir. 2006) (discussing difference of opinion among Circuits); United States v. Everett, 270 F.3d 986, 990 n.3 (6th Cir. 2001) (same). Some Circuits hold, as we do, that an intent to harm the bank, or at least expose it to risk, is required. See, e.g., United States v. Odiodio, 244 F.3d 398, 401 (5th Cir. 2001); United States v. Davis, 989 F.2d 244, 246-47 (7th Cir. 1993). But other Circuits hold a variety of other views. For example, the First Circuit, overruling earlier precedents, has held in a unanimous en banc decision that under either subsection, § 1344 requires only an intent to defraud a bank, and not an intent to *harm* a bank. United States v. Kenrick, 221 F.3d 19, 26-29 (1st Cir. 2000).[9] The Third Circuit has relied in part on Kenrick to conclude that "where the perpetrator had an intent to victimize the bank by exposing it to loss or liability, such conduct falls comfortably within the reach of § 1344," but that "where there is no evidence that the

[9] The Ninth, Tenth and Eleventh Circuits have adopted a similar rule. See United States v. McNeil, 320 F.3d 1034, 1037-40 (9th Cir. 2003); United States v. De La Mata, 266 F.3d 1275, 1298 (11th Cir. 2001); United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir. 1995).

perpetrator had an intent to victimize the bank, . . . merely an intent to victimize some third party does not render the conduct actionable under § 1344." United States v. Leahy, 445 F.3d 634, 647 (3d Cir. 2006). The Third Circuit thus requires not intent to *harm*, but intent to *victimize*, which appears to include a case, such as this one, in which the bank was the "target of deception." Id. at 646-67 (internal quotation marks omitted).[10] The Sixth Circuit, relying on the plain language of § 1344(2), has held that it is "sufficient if the defendant in the course of committing fraud on *someone* causes a federally insured bank to transfer funds under its possession and control." Everett, 270 F.3d at 991. The Eighth Circuit has held that while subsection (2) requires "'some loss to the institution, or at least an attempt to cause a loss,'" while subsection (1) only requires that the defendant have "'defraud[ed]'" the institution. Staples, 435 F.3d at 867, quoting United States v. Ponec, 163 F.3d 486, 488 (8th Cir. 1998).[11] My own view, as expressed in this opinion, is consistent Judge Lipez's careful opinion in Kenrick for the unanimous First Circuit.

Thus, while the force of our Court's precedent compels me to concur in the judgment of the Court, I am firmly convinced that we are on the wrong side of the conflict among the circuits on the issue that controls this case, and I hope and trust that when the Supreme Court sees fit to resolve the conflict, it will reject our Circuit's rule.

---

[10] See Leahy, 445 F.3d at 645 n.9 (explaining the distinction, and noting that "[w]ere there a specific intent to harm element, a jury might not convict a defendant whose intent was to enrich himself or steal from a third party, yet who lacked any desire to harm or injure the bank").

[11] This is somewhat akin to the distinction I advance in this opinion, although I take the opposite view of which subsection has which effect.